In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-1867, 06-2662, 06-2714 & 06-2843

IN THE MATTER OF:

UAL CORPORATION (PILOTS' PENSION
PLAN TERMINATION)

APPEALS OF:

UNITED AIRLINES, INC.; PENSION BENEFIT GUARANTY
CORPORATION; AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL; AND UNITED RETIRED PILOTS
BENEFIT PROTECTION ASSOCIATION, *et al.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 05 C 6220 (**John W. Darrah**, *Judge*) and
06 C 1222 (**Joan Humphrey Lefkow**, *Judge*).

ARGUED SEPTEMBER 26, 2006—DECIDED OCTOBER 25, 2006

Before BAUER, POSNER, and EASTERBROOK, *Circuit
Judges.*

EASTERBROOK, *Circuit Judge.* Earlier this year we held
that United Airlines and its unionized pilots had reached a
valid bargain in which the pilots' union, in order to improve
United's chance of successful reorganization in bankruptcy,
agreed not to oppose its termination of its defined-benefit
pension plan. *In re UAL Corp. (URPBPA)*, 443 F.3d 565 (7th
Cir. 2006) (*URPBPA I*). In exchange for their acquiescence,

the active pilots stood to receive $550 million in convertible notes in the reorganized firm, plus a new defined-contribution pension plan.

This agreement contemplated that United would maintain the defined-benefit plan through the end of June 2005, though without making additional monthly contributions to the plan's trust fund. During those months, pilots' accrued benefits would rise because of additional work credits, and an annual cost-of-living increase would kick in. When the defined-benefit plan ended, all pilots (active and retired) would continue to receive reduced monthly benefits. "Termination" of a plan does not end anyone's right to receive vested benefits; it just prevents an increase in those benefits, which will be paid from the trust and, to the extent that fund is insufficient, by the Pension Benefit Guaranty Corporation. (What the PBGC can pay is limited by 29 U.S.C. §1322(b)(3), so vested benefits of well-paid retirees such as airline pilots are not fully insured.) Because the funds in trust for the pilots' plan at United were insufficient to pay the promised benefits, termination required the PBGC to step in with a hefty federal subsidy.

The PBGC was unwilling to underwrite the extra benefits that would become vested during the first six months of 2005, benefits that the district court valued at approximately $84 million. It filed an adversary action in the bankruptcy proposing to terminate the plan at the end of 2004. Meanwhile United proposed to end the payment of supplemental retirement benefits, from its corporate funds, that exceeded what could be offered through a tax-qualified pension plan—which is to say, a plan the benefits of which are taxed to employees as they are paid after retirement, rather than when the work is performed and wages earned. (The parties refer to these payments as "non-qualified benefits," but that's a misnomer. Pension plans, and contributions to them, may or may not be "qualified" in the sense of deferring income tax from the time wages are

earned until the pensions are disbursed; particular benefit payments always are taxable income when distributed. We therefore refer to the benefits as "supplemental," meaning supplemental to the tax-qualified pension plan, rather than as "non-qualified.") The Union (the Air Line Pilots Association, International, or ALPA) acknowledged that these benefits would end as soon as the defined-benefit pension plan terminated—for a plan's termination limits pension benefits to their vested and insured level—but the parties' agreement of January 2005 (the "Letter Agreement" for short) stipulated that this meant continuation until a court formally terminated the agreement. ALPA insists that this means the date of judicial decision, not the date of the plan's termination.

After a considerable delay caused by assignment of the PBGC's action to Chief Bankruptcy Judge Wedoff, followed by District Judge Darrah's decision (after a trial had been held in the bankruptcy court) that only a district judge could act on that non-core subject, the matter came to rest with District Judge Lefkow. She thought that $84 million would be an "unreasonable increase" in the PBGC's liability; under 29 U.S.C. §1342(a)(4), that conclusion justified termination of the pension plan at the end of 2004. 436 F. Supp. 2d 909 (N.D. Ill. 2006). But Judge Lefkow did not release this decision until June 2006. Judge Wedoff, whose authority over the supplemental pension benefits was secure under 28 U.S.C. §157(b)(1) because United's request for relief was a core proceeding, concluded in February 2005 that it must continue paying while he, then Judge Darrah, and finally Judge Lefkow, mulled over the PBGC's request to set a termination date in 2004. In October 2005 United renewed its request to cease paying—for by then the pension plan would have ended even had the PBGC not sought an earlier termination date. Judge Wedoff again denied this request but allowed United to put the supplemental retirement benefits for October and later months in

a segregated account while the PBGC's suit continued. United appealed to Judge Darrah. See 28 U.S.C. §158(a). He dismissed the appeal as "unripe" because final decision in the PBGC's adversary proceeding lay ahead.

We have consolidated four appeals from these decisions. The PBGC, the ALPA, and a group of retired pilots (the United Retired Pilots Benefit Protection Association, or URPBPA) have appealed from Judge Lefkow's order. United has appealed from Judge Darrah's refusal to decide whether it must pay supplemental benefits for October 2005. Judge Wedoff entered a separate order requiring United to pay supplemental retirement benefits through February 1, 2006, when its plan of reorganization took effect; the plan, Judge Wedoff held, superseded the Letter Agreement and allowed United to stop paying at last, even though Judge Lefkow still had not decided whether the pension plan's termination date would be in December 2004 or June 2005. United appealed that decision to Judge Darrah, who affirmed on the ground that, by not taking an interlocutory appeal under 28 U.S.C. §158(a)(3) from Judge Wedoff's order in February 2005, United had forfeited any entitlement to further review of its obligations with respect to supplemental benefits. United has filed a notice of appeal (No. 06-3489) from that decision, and both ALPA and URPBPA have filed cross-appeals (Nos. 06-3548 & 06-3559) to argue that even the confirmation of the plan did not end United's obligation to pay supplemental benefits. We have stayed briefing in those three appeals until the other appeals have been resolved, as our handling of the October 2005 supplemental benefits may well resolve the controversy about payment for ensuing months too.

Of the four appeals, the PBGC's has the distinction of not seeking any relief—for the PBGC prevailed in the district court. It proposed a termination date of December 30, 2004; the court ruled in its favor. The PBGC's nose is out of joint because the court held a trial and made its own judgment

about how much extra it would have cost to keep the plan in force until the end of June 2005, and whether that amount (which the court fixed at $84.2 million, about $17 million less than the PBGC's calculation) would be an "unreasonable increase" in federal liability. The PBGC does not want to go through such a procedure again and asks us to hold that, instead of conducting an independent inquiry, the court should have limited review to the administrative record and deferred to the PBGC's evaluation. Appellate courts do not, however, review language in district judges' opinions—we review *judgments*, see *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987), and this judgment gave the PBGC everything it wanted. A litigant that prevails at trial may not appeal to contend that it should have won faster or cheaper on summary judgment; nor may the winner at trial protest what it deems (in retrospect) to have been needless discovery or rounds of briefing en route. What the PBGC wants from us—a remand directing the district judge to write a different opinion but enter the same judgment—is not within the judicial power under Article III. Fiddling with explanatory language, when the judgment is fixed, would be advisory.

This is not to say that a prevailing litigant must abandon its views on intermediate legal questions. A winner may defend its judgment on any ground preserved in the district court, without need for a cross appeal. See, e.g., *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479 (1976). The PBGC takes this as a fallback position, even if Article III precludes a remand with instructions to rewrite the opinion while reentering the same judgment. So our first question is whether review should have been deferential, for if the answer is yes then we may affirm (on ALPA's and the retired pilots' appeals) without further ado.

Deference is appropriate when agencies wield delegated interpretive or adjudicatory power—the former usually demonstrated by rulemaking and the latter by admini-

strative adjudication (which also may yield rules in common-law fashion). See *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001). The PBGC did not use either rulemaking or adjudication to decide that United's plan should be wrapped up at the end of 2004. Its decision was made unilaterally and was not self-executing. The only authority that the PBGC has under §1342 is to ask a court for relief. That implies an independent judicial role. See *Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990). When making its decision a court must respect any regulations issued after notice-and-comment rulemaking, but the PBGC has not promulgated any rules pertinent to this subject. Nor has it issued the sort of interpretive guidelines that deserve the court's respectful consideration even though they lack the power to control. See, e.g., *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). All the PBGC had done is commence litigation, and its position is no more entitled to control than is the view of the Antitrust Division when the Department of Justice files suit under the Sherman Act. See, e.g., *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212-13 (1988). As the plaintiff, a federal agency bears the same burden of persuasion as any other litigant.

Nothing in 29 U.S.C. §1342(c), which describes the judicial function after the PBGC files an action seeking termination, suggests that the court must defer to the agency's view. Nonetheless, the PBGC insists that we should look past the statutory language and follow *PBGC v. LTV Corp.*, 496 U.S. 633, 647-51 (1990), which held that the agency receives *Chevron*-style deference (see *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)) to the extent that it has issued opinions interpreting another of its statutes, 29 U.S.C. §1347.

Section 1347 allows the PBGC to revive a terminated pension plan. This is a unilateral act; restoration does not require judicial approval, though like other agency action it may be reviewed in court under the Administrative Procedure Act, 5 U.S.C. §706, which requires the court to

respect agency action that is not arbitrary, capricious, or in violation of law. In a series of opinion letters, the PBGC concluded that the restoration power should be used when employers create follow-on plans. A "follow-on plan" is one that wraps around the federal insurance program and gives current and retired employees substantially the same benefits they would have enjoyed had the original plan not been terminated. LTV's pension plan was underfunded by about $2.3 billion, and when the plan was terminated in LTV's bankruptcy the federal insurance fund had to make up about $2.1 billion of that shortfall. LTV and its unions then negotiated a new pension plan that, when added to the federal insurance benefits, gave workers and retirees the same retirement income they would have enjoyed had the plan not been terminated. Investors and workers thus did not share the pain; all loss from the employer's imprudently high pension promises fell on the taxpayers. The PBGC, following its long-held views, concluded that the termination-and-follow-on procedure amounted to a raid on the Treasury and restored the plan under §1347—a step that ended the federal insurance benefits and required LTV to make up the $2.3 billion funding shortfall on its own. The Supreme Court held that by doing this the PBGC did not contradict §1347 or abuse its discretion.

Although the agency wants us to conclude that *LTV* entitles all of its acts to *Chevron* deference, that is not what the Court held. Section 1347 enables the PBGC to make self-executing orders, which is what leads to deferential review under the APA. Section 1342, by contrast, requires the PBGC to initiate litigation. Review under the APA differs substantially from the sort of position that an agency must assume when, like any other litigant, it must demonstrate a preponderance of the evidence in order to prevail. See *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994). After *Mead* and *Christensen*, the sort of opinion letters to which the Court deferred in *LTV* would receive, not *Chevron* deference, but respectful consideration under

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). As it happens, the difference between *Chevron* and *Mead-Skidmore* deference does not matter today, because the PBGC has not issued any opinion letters that bear on the disposition of this litigation. It demands deference not to its policies but to a fact-specific conclusion that the Letter Agreement between United and the ALPA exposed the insurance fund to an "unjustified increase" in liability. Section 1342(c) gives the resolution of that question to the judiciary; the PBGC participates as a litigant, not as the decision-maker.

The question that Judge Lefkow had to resolve was not whether United's plan will terminate—the requirements for a distress termination have been met no matter what the PBGC thinks, and the Letter Agreement removes the obstacle otherwise present when a collective-bargaining agreement is involved, see 29 U.S.C. §1341(a)(3), (c)(2)(B)(ii)—but what the effective day of that termination would be. The retired pilots' appeal fails to reckon with the limits of this litigation. What the retirees want is nothing less than indefinite continuation of the plan. If American Airlines can afford a pension plan, the retired pilots insist, then so can United Airlines. That's water under the bridge, however. *URPBPA I* holds that United and the ALPA were entitled to agree on the plan's termination. A companion decision, released today, reiterates that conclusion in rejecting the retired pilots' objections to the plan of reorganization, which ends any possibility of resurrecting this pension plan. See *In re UAL Corp.*, No. 06-2780 (7th Cir. Oct. 25, 2006). No more need be said about the retired pilots' appeal.

While United and its unions were negotiating, United and the PBGC had their own round of discussions. An employer that terminates an underfunded plan becomes liable to the PBGC for the amount of the shortfall. 29 U.S.C. §1362. United was in economic distress and could not satisfy that obligation in liquid assets; the PBGC agreed to accept about

$1.5 billion of stock in the post-reorganization United. As part of this bargain, the PBGC agreed that United could continue three of its pension plans (those covering flight attendants, mechanics, and general office personnel) through June 30, 2005. The PBGC reserved its right to seek earlier termination of the pilots' plan under §1342(a)(4); United, which had given the ALPA a most-favored-nations agreement (promising that it would not end the pilots' plan before the plans covering other workers) kept its bargain and refused to accede to the PBGC's demand, which led to the adversary action. Now the ALPA contends that, by accepting equity securities in lieu of cash on account of the employer's shortfall liability, the PBGC has forfeited its right to seek early termination. But how so, when the settlement agreement expressly reserved the right to seek this relief? It is not as if United topped up the pension trust to cover the additional benefits that would become vested during the first six months of 2005. It stopped contributing to the pilots' plan in 2002, when the bankruptcy began, and the offer of stock in (partial) satisfaction of the shortfall would not have mitigated the loss to the federal insurance fund from adding six more months of vested benefits in 2005.

So is $84 million, the (net) cost to the PBGC of continuing the pilots' plan through the first six months of 2005, an "unreasonable increase" in federal liability? Reasonableness is an issue of fact and is reviewed deferentially on appeal; that reasonableness is "the ultimate issue" does not change that standard. See *Pullman-Standard v. Swint*, 456 U.S. 273 (1982). The dispute is case-specific, which almost always implies deferential appellate review. See, e.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401-02 (1990); *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 933 (7th Cir. 1989) (en banc).

The pilots' union maintains that $84 million is not an unreasonable increase because it is small in relation to the

total obligations of the plan (several billion dollars), the assets in the PBGC's insurance fund, the cost of an aircraft carrier, or the national government's annual budget. That is not, however, the right perspective. Any number can be made to look trifling by comparing it with some much larger number, but the exercise is so easy that the comparison is unhelpful. Eighty-four million dollars is substantial by any normal calculation. The district court concluded that the right question is whether the federal Treasury receives value for money; if not, the marginal outlay is "unreasonable." This $84 million would not buy the insurance fund anything of value. Nor was it necessary to provide the pilots with a minimally satisfactory retirement: they are well compensated even after the termination, since many will receive benefits at the statutory maximum.

The incremental $84 million was a bargaining chip between United and the Union: to obtain ALPA's assent to the termination, United offered the pilots an extra six months of benefits to be underwritten by a third party, the PBGC. No wonder it objected. The deal between United and the unions exemplifies the moral hazard to which insurance gives rise. Insured parties alter their behavior to take advantage of the third-party payor; insurers must respond by making such maneuvers more difficult. That's why the PBGC proposed early termination. The district court did not abuse its discretion in concluding that any extra outlay attributable to the moral hazard created by insurance would be an "unreasonable increase" in the federal commitment, given the substantial amount that the PBGC already was committed to pay toward the pilots' benefits.

Once the PBGC files suit, the district court sets the termination date. 29 U.S.C. §1348(a)(4). The pilots' union maintains that December 30, 2004, is too early even if June 30, 2005, is too late, but the district judge was not required to split the difference between the ALPA and the PBGC. That United had promised the Union not to agree to a date

before June 30 does not affect either the PBGC or the court, for they are strangers to the bargain.

As for the supplemental payments: these end with the defined-benefit plan, which means that nothing is due for October 2005 or later. (United has not proposed to recapture payments disbursed for January through September 2005.) When Judge Darrah dismissed United's appeal as "unripe," Judge Lefkow had not yet made her decision, so Judge Darrah could not be sure where in the range December 2004 through June 2005 the pilots' plan would end, but any of the possible dates came before October 2005, so it is unclear why Judge Darrah thought the appeal premature. If the supplemental benefits end at the plan's termination, then reversal was in order; if, as ALPA insists, the benefits continue until a court makes the final decision, then affirmance was in order (for the termination-date dispute remained unresolved as of October 2005); it is impossible to understand why Judge Darrah thought that there was nothing to do but dismiss the appeal.

Indeed, it is impossible to see how an appeal *ever* could be dismissed as "unripe," and Judge Darrah did not cite any statute or case law in support of his decision. Ripeness is a quality of *disputes*, not of appeals. If the dispute about whether United must pay the supplemental benefits for October 2005 was not ripe for resolution, then the district court should have vacated Judge Wedoff's decision as premature. For appellate tribunals (including district judges deciding appeals in bankruptcy), the relevant doctrine is finality, not ripeness. See *United States v. Jose*, 519 U.S. 54 (1996). If the *order* is final, then an appeal is proper whether or not the *dispute* is ripe for resolution. A timely appeal filed after premature action by the lower court can lead to one of two actions: the appellate body vacates the premature decision, or the appellate body keeps the dispute under advisement until it becomes ripe and a decision properly may be rendered. See *Buckley v. Valeo*,

424 U.S. 1, 114-17 (1976) (dispute resolved on the merits on appeal, even though the controversy was not ripe at the time the district court acted). If the dispute is ripe, then it must be resolved on the merits—as Judge Darrah later was to do for the months November 2005 through January 2006, even though Judge Lefkow still had not fixed the plan's termination date. Dismissal of the appeal, leaving the aggrieved party without recourse (it can't file a second notice of appeal later, for the time to appeal will have expired), is the one impermissible outcome, expressly forbidden by *Jose*.

It is unnecessary to remand, since we can resolve this legal dispute as easily as the district court could (and without the need for a second round of appeals). There are three possible resolutions. First, United's obligation to pay supplemental benefits may end with the plan, and if that is so then it need not pay supplemental benefits for October. Second, United's obligation may continue as long as the dispute about the termination date is still in litigation, and if that is so then United must pay supplemental pension benefits for October 2005. Third, United may have forfeited its legal rights by failing to appeal in February 2005, and again this means that it must pay the October benefits. It is this third conclusion that Judge Darrah reached when he resolved the appeal with respect to benefits for November through January, see 2006 U.S. Dist. LEXIS 66305 (N.D. Ill. Aug. 30, 2006), and that ALPA urges us to adopt with respect to the October 2005 benefits.

Lawyers often argue that failure to take an available interlocutory appeal forfeits any opportunity to present the argument later, but this proposition has not fared well. See, e.g., *United States v. Clark*, 445 U.S. 23, 25 n.2 (1980) (citing lots of earlier decisions holding that failure to take an interlocutory appeal does not waive or forfeit any legal position); *Kurowski v. Krajewski*, 848 F.2d 767 (7th Cir. 1988). Thirty years ago we called "frivolous" an argu-

ment that failure to take an interlocutory appeal forfeits the litigant's position. *Tincher v. Piasecki*, 520 F.2d 851, 854 n.3 (7th Cir. 1975). It has not gained support in the intervening years, so it is surprising to see it adopted by a district judge—whose terse opinion does not cite any authority. Litigants bypass opportunities for interlocutory review all the time. For example, a decision to issue (or deny a motion for) a preliminary injunction is an appealable order, but a litigant who decides to accept defeat at that stage and proceed straight to resolution of the permanent injunction does not thereby give up all chance of prevailing on the merits. *Retired Chicago Police Association v. Chicago*, 7 F.3d 584, 608 (7th Cir. 1993). Likewise public officials who could appeal before trial to present claims of official immunity need not do so, and they may raise an immunity defense on appeal from the final decision. That's the holding of *Kurowski*. As we remarked there (848 F.2d at 773):

> The privilege to take an interlocutory appeal exists for the appellant's protection. Such appeals come at great cost to the judicial system because they may prolong litigation and require appellate courts to cope with each case more than once. Most interlocutory appeals end in affirmance (thus entail wasted motion), because district judges dispose correctly of the vast majority of motions. If the aggrieved party is content to swallow his losses and proceed with the case . . . no interest of either the judicial system or the adverse party is served by treating the whole subject as forfeit. That would simply induce [litigants] to file more interlocutory appeals.

Just so with interlocutory appeals in bankruptcy. If United was willing to pay the supplemental retirement benefits for February 2005, and let the subject slide until October, that was its own loss (and the retirees' gain); a legal rule declaring the legal position lost forever would

lead prudent lawyers to file appeals early and often, pouring molasses on the judicial process.

Thus the only remaining question is whether the Letter Agreement between United and ALPA compels United to pay supplemental retirement benefits until the judiciary sets the termination date. The Letter Agreement provides that the pilots' plan will terminate at the close of June 2005, and that until the court acts—for termination of an underfunded plan at the employer's behest requires judicial approval under 29 U.S.C. §1341(c)(2)(B)(ii)—the plan "shall remain in full force and effect". (Although the Letter Agreement does not refer to the supplemental benefits, everyone assumes that their treatment matches that of regular pension benefits.) The Agreement's "full force and effect" clause applies until all appeals from the bankruptcy judge's decision about the distress termination have been exhausted, or the plan of reorganization has come into force. This is the language that, as the ALPA sees things, requires the continuation of supplemental benefits until February 1, 2006, when the plan of reorganization took effect.

The problem with this line of argument is that, by the time the bankruptcy judge approved the Letter Agreement, the PBGC had taken matters out of United's hands by asking the court to terminate the pension plan earlier. There never was to be a proceeding under §1341(c)(2) (B)(ii). Nor was termination to wait until some judicial decision or appeal; what the PBGC wanted—and what the district court gave it, properly we have just held—is retroactive termination. That pulled the rug out from under the Letter Agreement's fundamental assumption about timing. United and the ALPA spoke only for themselves; they could not speak for the court, the PBGC, or United's other unsecured creditors. If, as the parties have agreed, the supplemental benefits end with the pension plan, the only possible date for that cessation is December 30, 2004.

Section 1342(a)(4) allows a court (at the PBGC's request) to override private agreements. See also *In re UAL Corp.*, 428 F.3d 677 (7th Cir. 2005) (holding that action of the PBGC overrode the pension clauses in a collective bargaining agreement between United and the flight attendants' union). United and its unions lacked authority to set a termination date once the PBGC intervened, and a side agreement that all benefits persist until a privately selected termination date is untenable when the court sets its own date. Maintaining the supplemental benefits—which are defined as the difference between the contractually agreed pension payments and what an ERISA plan can provide—after the Plan's termination date would make the supplements a kind of follow-on plan, designed to maintain the retirees' position (through the plan of reorganization) while transferring as much of the obligation as possible to the public fisc. For the reasons given in *LTV*, that is incompatible with the PBGC's insurance function.

Indeed, the "full force and effect" clause of the side agreement is untenable (as applied to the supplemental benefits) quite apart from §1342(a)(4). The supplemental benefits were deferred compensation for labor the retired pilots furnished before United entered bankruptcy. The retirees were unsecured creditors with respect to these benefits. The defined-benefit pension plan itself was supported by a trust fund, but because paying these extra benefits through the trust would have cost both United and the pilots the value of tax deferral, these supplemental payments were kept separate from the trust. As a debtor in bankruptcy, United had no power to pay one group of unsecured creditors in full while sending most others away with less than 10¢ on the dollar, and the bankruptcy court lacked authority to approve any such preference over protest. See *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004). No one has argued that the court's authority to classify debts would sup-

port a difference of this magnitude. Nor can the supplemental benefits be paid in full as current wages covered by the priority in 11 U.S.C. §507(a)(3)(A) (preference for wages, not to exceed $4,925 per employee, earned during the 90 days before bankruptcy commences). They are neither current nor wages.

Payment of these sums therefore has been problematic from the outset of the bankruptcy. Given the parties' agreement that these benefits do not (as a matter of pre-bankruptcy contract) outlast the pension plan, it does not make sense to mandate their continuation after the plan's termination date, at 100¢ on the dollar, while other unsecured creditors get much less. United therefore is not required to make the payments for October 2005 or later months. What the retirees are entitled to is not full payment but an unsecured claim equal to the value of these benefits. (We discuss the handling of that unsecured claim in the companion opinion, No. 06-2780, slip op. 6.)

This does not mean that "United" becomes wealthier at the retirees' expense. "United" is just a collective name for all stakeholders. Old unsecured debts were converted to equity in the reorganized United, so money in the firm's bank account is value to the former unsecured creditors, who obtain a (very slightly) larger return on their loans. (As we have mentioned, both active and retired pilots are among these unsecured creditors.)

The PBGC's appeal (No. 06-2843) is dismissed for want of jurisdiction because it requests an advisory opinion. On the appeals of ALPA and the URPBPA (Nos. 06-2662 and 06-2714) the judgment terminating the pilots' pension plan as of December 30, 2004, is affirmed. On United's appeal (No. 06-1867) with respect to the October benefits order, the judgment is reversed and the case is remanded with instructions to enter a judgment allowing United to reclaim the contents of the segregated fund.

A true Copy:

      Teste:

              _____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*