**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1045
_____

JAMES R. ADAMS

v.

GOVERNOR OF DELAWARE,

Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-17-cv-00181)
Honorable Mary Pat Thynge, U.S. Magistrate Judge

_____

Argued September 25, 2018

Before:  MCKEE, RESTREPO, and FUENTES, *Circuit
Judges*.

(Filed: April 10, 2019)

David C. McBride   [Argued]
Pilar G. Kraman
Martin S. Lessner
Young Conaway Stargatt & Taylor
1000 North King Street
Rodney Square
Wilmington, DE 19801

   *Counsel for Appellant*

David L. Finger [Argued]
Finger & Slanina
1201 Orange Street
One Commerce Center, Suite 725
Wilmington, DE 19801

   *Counsel for Appellee*

———————————

OPINION OF THE COURT
———————————

FUENTES, *Circuit Judge*.

James R. Adams is a resident and member of the State Bar of Delaware.  For some time, he has expressed a desire to be considered for a judicial position in that state.  Following the announcement of several judicial vacancies, Adams considered applying but ultimately chose not to because the announcement required that the candidate be a Republican.

Because Adams was neither a Republican nor a Democrat, he concluded that any application he submitted would be futile.

Adams brings this suit against the Governor of the State of Delaware to challenge the provision of the Delaware Constitution that effectively limits service on state courts to members of the Democratic and Republican parties. Adams claims that under the Supreme Court's precedent in *Elrod v. Burns*[1] and *Branti v. Finkel*,[2] a provision that limits a judicial candidate's freedom to associate (or not to associate) with the political party of his or her choice is unconstitutional. The Governor argues that because judges are policymakers, there are no constitutional restraints on his hiring decisions and he should be free to choose candidates based on whether they belong to one of the two major political parties in Delaware— that is, whether they are Democrats or Republicans. We disagree and conclude that judges are not policymakers because whatever decisions judges make in any given case relates to the case under review and not to partisan political interests. We therefore conclude that the portions of Delaware's constitution that limit Adams's ability to apply for a judicial position while associating with the political party of his choice violate his First Amendment rights, and we will accordingly affirm in part and reverse in part the District Court's grant of summary judgment in favor of Adams.

---

[1] 427 U.S. 347 (1976).
[2] 445 U.S. 507 (1980).

## I. Background

### A. Article IV, Section 3 of the Delaware Constitution

In 1897, Delaware was unique in its method of judicial selection—it was the only state in the country in which the governor appointed judges without legislative involvement.[3] Judicial selection became an important and contentious topic during Delaware's constitutional convention that year. Debating whether or not to move to a system of judicial election, delegates to the convention expressed their deep concern over the politicization of the judiciary. John Biggs, Sr., the president of the convention, explained his position that the appointment of judges would enable judges to remain free from political cronyism and partisanship:

> I think it would be very unwise that our Judges should be mixed up, I will say, in politics. We can obtain good men in this way, by the confirmation by the Senate, without those men being under political obligations, such as are engendered at primaries and at general elections.
>
> And there are reasons, it occurs to me, why the Judges should not be elected that perhaps do not apply to

---

[3] Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 128 (2002).

any other officers. For after all, Judges are but human. Whoever sits upon the Bench to pass upon the rights of yours as to your liberty and your property ought certainly to be as free from all influence and bias, political and otherwise, as it is possible to throw around that man.[4]

The delegates ultimately recommended amending the Delaware Constitution to provide for gubernatorial nomination of judges, with confirmation by the Senate. They did not stop there, however, and debated a novel approach designed to make the judiciary "non-partisan, or if it be a better word, bi-partisan"—a limitation on the number of judges from one party that could sit on the bench at any given time.[5]

Some delegates voiced their support for the provision, stating that minority representation on the judicial bench would "bring about a fuller and freer discussion of these matters that come before them and that they may make fair and impartial decisions on those questions."[6] Some, however, expressed concern that the provision would bring about the opposite result. As delegate Andrew Johnson explained:

It is well known that [judges serving on Delaware's] Judiciary at the present time have been

---

[4] J.A. 117–18.
[5] J.A. 130.
[6] J.A. 133.

5

appointed from one political party. That probably is not the best course to pursue, and I would be very glad to see the Governor of this State appoint well equipped men from another party. I would hail the day when it was done and would be glad to have it; but to vote to compel a Governor to appoint a man on account of his political affiliation, you are simply saying, "You are put upon the Bench to look out for our party interests whenever they come up." There is no other construction that you can put upon it. There can be no other, in my own mind, established, and that man is expected, whenever a political question arises, before that Court to take care of his own party rights or privileges.[7]

Ultimately, the provision prevailed, and Delaware's constitution has included some form of a political balance requirement ever since. In 1951, as part of a wider series of structural changes to the Delaware judiciary, the provision was modified to exclude third party and unaffiliated voters from applying to serve as judges on the Supreme Court, Superior Court, and Chancery Court in Delaware. The system thus created is binary, excluding all candidates from consideration

---

[7] J.A. 134.

except those of the Republican or Democratic parties. The provision has been reaffirmed during the amendment process several times, including in 2005. Article IV, Section 3 of the Delaware Constitution now reads in relevant part:

> Appointments to the office of the State Judiciary shall at all times be subject to all of the following limitations:
>
> First, three of the five Justices of the Supreme Court in office at the same time, shall be of one major political party, and two of said Justices shall be of the other major political party.
>
> Second, at any time when the total number of Judges of the Superior Court shall be an even number not more than one-half of the members of all such offices shall be of the same political party; and at any time when the number of such offices shall be an odd number, then not more than a bare majority of the members of all such offices shall be of the same major political party, the remaining members of such offices shall be of the other major political party.

Third, at any time when the total number of the offices of the Justices of the Supreme Court, the Judges of the Superior Court, the Chancellor and all the Vice-Chancellors shall be an even number, not more than one-half of the members of all such offices shall be of the same major political party; and at any time when the total number of such offices shall be an odd number, then not more than a bare majority of the members of all such offices shall be of the same major political party; the remaining members of the Courts above enumerated shall be of the other major political party.

Fourth, at any time when the total number of Judges of the Family Court shall be an even number, not more than one-half of the Judges shall be of the same political party; and at any time when the total number of Judges shall be an odd number, then not more than a majority of one Judge shall be of the same political party.

Fifth, at any time when the total number of Judges of the Court of

Common Pleas shall be an even number, not more than one-half of the Judges shall be of the same political party; and at any time when the total number of Judges shall be an odd number, then not more than a majority of one Judge shall be of the same political party.[8]

Thus, the provision is made up of five sections—one addressing the Supreme Court, one addressing the Superior Court, one addressing combined membership of those courts and the Chancery Court, one addressing the Family Court, and, finally, one addressing the Court of Common Pleas. Significantly, there are also two separate, but connected, substantive components: the bare majority component (which limits the number of judicial positions that can be occupied by members of a single political party)[9] and the major political party component (which mandates that the other judicial positions must be filled with members of the other major political party in Delaware). In practice, then, most courts must be filled with Democrats and Republicans exclusively.

---

[8] Del. Const. art. IV, § 3.

[9] When there are an even number of judges on a given court, no more than half of the judicial seats may be held by members of a single political party. When there is an odd number of judicial positions, no more than a bare majority (that is, one seat above half) may be held by members of a party. *Id.*

### B. Judicial Nominations in Delaware

Since 1978, Delaware governors have relied on judicial nominating commissions to identify qualified candidates for judicial appointments.[10] Eleven of the twelve commission members are appointment by the Governor, and the twelfth is appointed by the president of the Delaware State Bar Association with the consent of the Governor.[11] The commission provides a list of three recommended candidates to the Governor. The Governor is not free to ignore the commission's recommendations; if he is not satisfied with the list, the commission generates another list of candidates.[12] The nominating commission is politically balanced and comprised of both lawyers and non-lawyers.[13]

When a judicial position becomes available, the nominating commission gives public notice of the positions available, the salary, and the job requirements, including the party membership required for nomination. For example, in August 2012, the commission gave notice of five open judicial positions, of which three were open only to candidates who were members of the Democratic Party and two were open to members of either political party.

---

[10] Holland, *supra* note 3, at 129.

[11] *See* Executive Order 16, *available at*: https://governor.delaware.gov/executive-orders/ eo16/.

[12] Holland, *supra* note 3, at 129.

[13] *Id.*

### C. James Adams's Search for a Judicial Position

James Adams, a member of the Delaware State Bar, is an Independent who desires a judicial position but has not applied for one due to his current political affiliation.

Throughout his career, Adams was a registered Democrat and participated with the Democratic Party. In early 2017, that changed, as Adams became an Independent voter for the first time.[14] Adams explained that he changed his affiliation because he is progressive and grew frustrated with the centrism of the Democratic Party in Delaware. He now describes himself as "more of a [Vermont Senator] Bernie [Sanders] independent."[15]

Around the same time, Adams read an essay questioning the constitutionality of Article IV, Section 3. The essay focused in large part on the portion of the provision that requires judicial applicants to be members of one of Delaware's two major political parties, and posed the question: "May Delaware enforce a state law providing that no Independent or member of a minor party shall be appointed to a judgeship?"[16] After reading the article, Adams decided to

---

[14] Adams's new voter registration card, indicating that he is unaffiliated with a political party, is dated February 13, 2017 and was mailed to him on February 14, 2017. Adams cannot remember the exact day that he switched his party affiliation.

[15] J.A. 74.

[16] *See* Joel Edan Friedlander, *Is Delaware's 'Other Major Political Party' Really Entitled to Half of Delaware's Judiciary?*, 58 Ariz. L. Rev. 1139, 1154 (2016).

challenge the provision.  He filed the instant lawsuit against John Carney, the Governor of the State of Delaware, in February 2017.  At the time he filed the lawsuit, he pointed to two judicial vacancies that both required Republican candidates.

Although Adams did not apply for either of those judicial positions, he has applied to similar positions in the past.  In 2009, Adams applied to be a Family Court Commissioner, but was not selected. In 2014, Adams considered applying for judicial positions on the Supreme Court and the Superior Court; however, at the time he was registered as a Democrat and the positions were open only to Republican candidates.  Shortly thereafter, in 2015, Adams retired and assumed emeritus status with the Delaware State Bar.  By 2017 he felt ready to resume searching for a judicial position, and believed he was a qualified applicant.  He therefore returned to active status in 2017.  Notwithstanding his interest, Adams has refrained from submitting an application based on his belief that he would not be considered for a judicial position because of Article IV, Section 3 and his new affiliation as an Independent voter.

### D.     The District Court Proceedings[17]

Both parties filed cross-motions for summary judgment. The Governor argued primarily that Adams lacks both Article III and prudential standing to bring his claims, and Adams argued that the political balance requirement violates the First

---

[17] Both parties consented to the entry of final judgment by a Magistrate Judge. *See Adams v. Hon. John Carney*, Dkt. 2, No. 17 Civ. 181 (MPT) (D. Del. 2017).

12

Amendment because it conditions appointment on a judicial candidate's political affiliation.

The District Court determined that Adams had Article III standing to challenge some, but not all, of the sections of the provision. Chief Magistrate Judge Thynge considered the first three sections because they contain both a bare majority component and a major political party component. She concluded that although Adams did not apply for an open judicial position on one of those courts, his application would have been futile because the openings available around the time he filed his complaint were not available to Independents like himself.

Sections four and five, however, contain only the bare majority component, and Magistrate Judge Thynge concluded that Adams did not have standing to challenge those sections because his status as an Independent would not have prevented his application from being considered. She nevertheless concluded that he had prudential standing to challenge those sections and found that sufficient to confer jurisdiction.

Turning to the merits, Magistrate Judge Thynge determined that Article IV, Section 3 restricted access to a government position (here, a judgeship) based on political affiliation. She found that the narrow policymaking exception laid out in *Elrod* and *Branti*, which allows a government employer to make employment decisions based on political allegiance for policymakers, did not apply. In reaching that conclusion, the District Court drew on Third Circuit and Supreme Court cases emphasizing that a judge's job is to apply, rather than create, the law. The District Court also cited the Delaware Judges' Code of Judicial Conduct, which

13

mandates that judges refrain from political activity and instructs judges not to be swayed by personal opinion. Because political affiliation could not be seen as a necessary trait for effective judicial decisionmaking, and because the District Court concluded that judges do not meet the policymaking exception established in *Elrod* and *Branti*, she found the provision unconstitutional in its entirety. This appeal followed.[18]

## II. Discussion

### A. Standing

#### 1. Article III Standing

We begin by addressing Adams's constitutional standing. Constitutional standing, also referred to as Article III standing, is "a threshold issue that must be addressed before considering issues of prudential standing."[19] Because it is an essential component of subject matter jurisdiction, if Article III

---

[18] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment. *Curley v. Klem*, 298 F.3d 271, 276 (3d Cir. 2002).
[19] *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 269 (3d Cir. 2016) (quoting *Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 221 n.16 (3d Cir. 2004)).

standing is lacking, our inquiry must end and Adams's claim must be dismissed.[20]

To satisfy the "irreducible conditional minimum" of standing, a plaintiff must show that he has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[21] Of standing's three elements, "injury in fact, [is] the 'first and foremost.'"[22] "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[23] However, a plaintiff need not make futile gestures to establish that injury is actual and not conjectural.[24]

It is black letter that standing may not be "dispensed in gross."[25] Our cases demonstrate that we must ask not only whether Adams has standing to sue at all, but whether he has

---

[20] *See Lance v. Coffman*, 549 U.S. 437, 439 (2007).

[21] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[22] *Id.* (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)).

[23] *Id.* (quoting *Lujan*, 504 U.S. at 560).

[24] *Sammon v. New Jersey Bd. of Medical Examiners*, 66 F.3d 639, 643 (3d Cir. 1995).

[25] *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

standing to challenge part or all of Article IV, Section 3.[26] Accordingly, we do not ask only whether Adams has been injured by Article IV, Section 3 of the Delaware Constitution. We must identify how, if at all, he has been injured, and whether that injury stems from all or part of the provision.

Adams desires a judgeship, and he has applied for, or considered applying for, judicial positions since at least 2009. If he felt his application would be reviewed, he would consider applying for a judicial seat on any of Delaware's five constitutional courts. But because Adams is an Independent, he has refrained from submitting an application in light of the restrictions of Article IV, Section 3.

The District Court agreed with Adams that it would have been futile to apply for a judicial position on the Supreme Court, Superior Court, or Chancery Court, because under Delaware's constitution, judges on those courts must be members of one of Delaware's two major political parties, and Adams is not. The Governor does not contest that Adams has constitutional standing to challenge these provisions, and we agree that Adams has clearly been injured by the major

---

[26] *See Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 995 (3d Cir. 1993) ("Our standing inquiry has two parts: whether the Contractors have standing to challenge the Ordinance at all, and if so, whether they have standing to challenge all or just part of the Ordinance."); *see also Service Employee's Int'l Union, Local 3 v. Municipality of Mt. Lebanon*, 446 F.3d 419, 422 (3d Cir. 2006) (separately considering a union's standing to challenge each section of an allegedly unconstitutional municipality ordinance).

political party component and therefore has standing to challenge it.

But the District Court also concluded that Adams's application to either the Family Court or the Court of Common Pleas "would not have been futile, because there is no party requirement constitutionally attached to either Court."[27] Adams argues that the bare majority component injures him independently of the major political party component because it "limit[s] the right to a bare majority to members of a 'political party.'"[28] In his view, the bare majority component mandates that one of the two major political parties control a bare majority of judicial seats on the relevant court, thereby limiting an Independent's ability to successfully apply for a position. The component, however, creates a ceiling for members of the same political party; it does not create a floor entitling them to a certain number of judicial seats.[29]

Therefore, we agree with the District Court's reading of Article IV, Section 3 and conclude that Adams does not have standing to challenge the sections of the provision that contain only the bare majority component. Nevertheless, the District Court went on to conclude that Adams did not need to establish

---

[27] J.A. 13. The last two sections of the provision, which cover the Family Court and the Court of Common Pleas, contain only the bare majority component.

[28] Appellee's Br. at 13–14.

[29] As the District Court explained, the bare majority component "places no limitations on unaffiliated voters and only affects judicial candidates of a major political party when the bare majority of judicial offices on those courts is filled with individuals affiliated with that major political party." J.A. 29.

17

constitutional standing because he established prudential standing. The District Court's conclusion that prudential standing can serve as "substitute" standing for a plaintiff who cannot demonstrate constitutional standing is incorrect. While Article III standing is a threshold issue that implicates subject matter jurisdiction, prudential standing is not. Instead, it is a "judicially self-imposed limit[] on the exercise of federal jurisdiction."[30] Prudential standing cannot vest a court with subject matter jurisdiction; therefore, it cannot replace or substitute for constitutional standing, as without the latter, the case must be dismissed.[31] Therefore, because Adams does not have Article III standing with respect to the Family Court and the Court of Common Pleas, we may not consider the merits of his argument with respect to those courts.[32]

---

[30] *Davis v. City of Philadelphia*, 821 F.3d 484, 487 (3d Cir. 2016) (quoting *United States v. Windsor*, 570 U.S. 744, 757 (2013)).

[31] *See Lance*, 549 U.S. at 439.

[32] The Governor argues that because Adams lacked standing to challenge the sections of Article IV, Section 3 that contain only the bare majority component, he also cannot challenge the bare majority component even where it appears in the sections of Article IV, Section 3 governing the makeup of the Supreme Court, Superior Court, and Chancery Court, where the bare majority requirement is tied to the major political party component. The Governor's argument confuses the standing doctrine with the severability doctrine. When we consider standing, we ask whether the plaintiff before us has actually been injured by the statute or constitutional provision she challenges. *See Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61). When we consider severability, we ask whether all or only part of a constitutionally infirm statute must

18

## 2.    **Prudential Standing**

We next address whether the doctrine of prudential standing should give us pause before reaching the merits of the dispute over the first three sections of the political balance requirement.  Even when Article III standing is present, we look to prudential considerations "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those

_____

be stricken.  *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006).  The Governor's argument puts the cart before the horse by asking us to consider whether Adams would have standing to challenge the bare majority component if the major political party component were stricken from those sections.  But that is not what is before us, and we have never held that standing must be established independently for each clause of a challenged provision.  Once a plaintiff has met the Article III requirements for a particular constitutional or statutory provision, we have jurisdiction to turn to the merits of her case.  If we determine on the merits that part of the statute that has injured her is unconstitutional, we then ask whether part of the statute can remain intact while the unconstitutional part falls.  The Governor, recognizing as much, relies on our severability jurisprudence to argue that we should leave the bare majority provision intact without explicitly referencing the doctrine.  Recognizing his argument for what it is, we will address the severability of the two components after addressing the constitutionality of Article IV, Section 3.

litigants best suited to assert a particular claim."[33] Prudential standing requires "(1) that a litigant assert his or her own legal interests rather than those of a third party; (2) that the grievance not be so abstract as to amount to a generalized grievance; (3) and that the [plaintiff's] interests are arguably within the 'zone of interests' protected by the statute, rule, or constitutional provision on which the claim is based."[34]

We see no reason to ignore Adams's challenge to Article IV, Section 3 on prudential grounds. Although the question is surely one of broad social import in Delaware, Adams has established that aside from his political affiliation, he feels qualified for a judicial position and intends to apply for a judicial position if he is able. The provision may be of interest to many residents of Delaware, but Adams has shown that he has a particular legal interest in the constitutionality of Article IV, Section 3 because of his desire to apply for a judicial position while refraining from associating with either the Democratic or Republican parties.

The Governor's arguments to the contrary are unavailing. He states that Adams's interest in this case is "merely an academic exercise" because Adams switched his political affiliation in the days before filing this Complaint, and had not applied for a judicial position since 2009 although, as a registered Democrat until 2017, he could have.[35] Essentially, the Governor's argument asks us to discredit the portions of

---

[33] *Joint Stock Society v. UDV N. Am., Inc.*, 266 F.3d 164, 179 (3d Cir. 2001) (quoting *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 225 (3d Cir. 1998)).
[34] *Lewis v. Alexander*, 685 F.3d 325, 340 (3d Cir. 2012).
[35] Appellant's Br. at 24–25.

Adams's deposition in which he explained why he decided to leave the Democratic Party (he was frustrated by the lack of progressive Democrats in Delaware) and why he did not apply for a judicial position after 2009 (he found working for the late Beau Biden rewarding and therefore did not consider other career opportunities until after Biden's death in 2015). But in opposing a motion for summary judgment, the Governor was required to do more than speculate that Adams has deceived the Court about his genuine interest in applying for a judicial position.[36] The short time period in which Adams changed his party affiliation, read the law review article, and filed suit, without more, is insufficient to raise a genuine issue of material fact about Adams's prudential standing.

## B.     The *Elrod/Branti* Inquiry

We now turn to the heart of this appeal: whether the sections of Article IV, Section 3 of the Delaware Constitution that govern the Supreme Court, the Superior Court, and the Chancery Court run afoul of the First Amendment's guarantee of freedom of association. A trio of seminal United States Supreme Court cases explain the limits on a government employer's ability to consider a job candidate's political

---

[36] *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (a movant may not rely on "speculation and conjecture in opposing a motion for summary judgment").

allegiance and govern our analysis here: *Elrod*,[37] *Branti*,[38] and *Rutan*.[39] We discuss each case in turn.

In *Elrod v. Burns*, Justice Brennan, writing for the plurality, recognized that the practice of patronage dismissals—dismissing a civil servant because his political affiliation differed from the political party in power—is "inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment."[40] He explained that to justify terminating a public employee based on political allegiance, the government must show that the practice "further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights."[41] The plurality suggested that the government's interest in employee loyalty would allow it to discharge employees in policymaking positions based on political allegiance.[42] Although "no clear line can be drawn between policymaking and nonpolicymaking

---

[37] 427 U.S. 347 (1976).

[38] 445 U.S. 507 (1980).

[39] *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990).

[40] 427 U.S. at 357 (internal quotations marks omitted (quoting *Illinois State Employees Union v. Lewis*, 473 F.2d 561, 576 (1972))). In a concise concurrence, Justice Stewart, joined by Justice Blackmun, stated that a "nonpolicymaking, nonconfidential government employee" may not be discharged or threatened with discharge on the sole ground of his or her political beliefs. *Id.* at 375 (Stewart, J., concurring).

[41] *Id.* at 363.

[42] *Id.* at 367.

22

positions," the plurality instructed factfinders to consider the nature of the employee's responsibilities to determine whether or not he or she is in a policymaking position.[43]

The Court next examined the First Amendment implications of politically-motivated employment decisions in *Branti v. Finkel*. Summarizing *Elrod*, the Court stated that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency."[44] The Court, however, moved away from *Elrod*'s policymaking distinction and held that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."[45] The Court explained that some positions, like that of an election judge, might be political without being a policymaking role, and some, like that of a state university football coach, might involve setting policy without being political.[46]

In *Rutan*, the Court confirmed that the general prohibition on politically-motivated discharge also applies to decisions to promote, transfer, or hire an employee.[47] "Unless these patronage practices are narrowly tailored to further vital

---

[43] *Id.* at 367–68.

[44] *Branti*, 445 U.S. at 517.

[45] *Id.* at 518.

[46] *Id.*

[47] *Rutan*, 497 U.S. at 74.

government interests, we must conclude that they impermissibly encroach on First Amendment freedoms."[48]

The Governor of Delaware sets forth two arguments to justify his practice of requiring applicants for judicial positions to be Democrats or Republicans: first, the Governor argues that because judges are policymakers, they can be hired or fired based on their political affiliation without restraint, and second, the Governor argues that even if they are not policymakers, Delaware has an interest in political balance that justifies the restrictions set forth in Article IV, Section 3.

### 1. The Policymaking Exception[49]

In our cases applying *Branti*, *Elrod*, and *Rutan*, we have set forth criteria to aid us in determining whether an employee's job responsibilities would make political party allegiance an appropriate condition of employment. We consider "whether the employee has duties that are non-discretionary or non-technical, participates in discussions or

---

[48] *Id.* at 74.

[49] Adams argues that after *Branti*, the question of whether a government position involves policymaking is irrelevant. We disagree. As we have explained before, after *Branti*, "the fact that an employee is in a policymaking or confidential position is relevant to the question of whether political affiliation is a necessary job requirement but this fact is no longer dispositive . . . ." *Brown v. Trench*, 787 F.2d 167, 168–69 (3d Cir. 1986); *see also Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) ("The exception for 'policymaking' jobs exists because political loyalty is essential to the position itself.").

other meetings, prepares budgets, possesses the authority to hire or fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers."[50] The "key factor" is whether an employee in that position "has meaningful input into decisionmaking concerning the nature and scope of a major program."[51]  Using this analysis, we have concluded that political affiliation is an appropriate requirement for a director of a veterans' administrative services department,[52] an assistant director of public information,[53] assistant district attorneys,[54] city solicitors and assistant city solicitors,[55] a solicitor for the Northeast Pennsylvania Hospital and Education Authority,[56] and a city manager,[57] among others.  We have never before considered the role of a state judge.  We now conclude that a judicial officer, whether appointed or elected, is not a policymaker.

This outcome is clear from the principles animating *Elrod* and *Branti*.  The purpose of the policymaking exception is to ensure that elected officials may put in place loyal employees who will not undercut or obstruct the new

---

[50] *Galli*, 490 F.3d at 271 (citing *Brown*, 787 F.2d at 169).

[51] *Id.* (quoting *Armour v. County of Beaver, PA*, 271 F.3d 417, 429 (3d Cir. 2001)).

[52] *Waskovich v. Morgano*, 2 F.3d 1292, 1298–1303 (3d Cir. 1993).

[53] *Brown*, 787 F.2d at 169–70.

[54] *Mummau v. Ranck*, 687 F.2d 9, 10 (3d Cir. 1982).

[55] *Ness v. Marshall*, 660 F.2d 517, 520–22 (3d Cir. 1981).

[56] *Wetzel v. Tucker*, 139 F.3d 380, 384–86 (3d Cir. 1998).

[57] *Curinga v. City of Clairton*, 357 F.3d 305, 313 (3d Cir. 2004).

administration.[58]  If a job "cannot properly be conditioned upon allegiance to the political party in control," the policymaking exception is inappropriate.[59]  Judges simply do not fit this description.  The American Bar Association's Model Code of Judicial Conduct instructs judges to promote "independence" and "impartiality," not loyalty.[60]  It also asks judges to refrain from political or campaign activity.[61]  The Delaware Code of Judicial Conduct similarly makes clear that judges must be "unswayed by partisan interests" and avoid partisan political activity.[62]  The Delaware Supreme Court has stated that Delaware judges "must take the law as they find it, and their personal predilections as to what the law should be have no place in efforts to override properly stated legislative will."[63]  Independence, not political allegiance, is required of Delaware judges.

---

[58] *Elrod*, 427 U.S. at 367 ("A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate.  The justification is not without force, but is nevertheless inadequate to validate patronage wholesale.  Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end.").

[59] *Branti*, 445 U.S. at 519.

[60] Am. Bar Ass'n Model Code of Judicial Conduct Canon 1.

[61] *Id.* Canon 4.

[62] Del. Judges' Code Judicial Conduct Rules 2.4(A), 4.1.

[63] *Leatherbury v. Greenspun*, 939 A.2d 1284, 1292 (Del. 2007) (quoting *Ewing v. Beck*, 520 A. 2d 653, 660 (1987)).

Article IV, Section 3 itself illustrates that political loyalty is not an appropriate job requirement for Delaware judges. Delaware has chosen to considerably limit the Governor's ability to nominate judges on the basis of political expediency. Instead, the Governor must ensure that there are sufficient Democratic and Republican judges on the bench. Far from nominating only judges who will be loyal to his party, the Governor may be required by Delaware's constitution to nominate judges who belong to a different political party. The Governor, therefore, cannot credibly argue that he must be free to follow a rule excluding those who do not belong to the two major parties in Delaware because allegiance to his party is an appropriate condition for judicial employment.

Nor are we swayed by his argument that the important role judges play in Delaware transforms them into political actors. The Governor argues that by interpreting statutes, sentencing criminal defendants, and crafting the common law, judges in Delaware make policy and exercise significant discretion. But the question before us is not whether judges make policy,[64] it is whether they make policies that necessarily reflect the political will and partisan goals of the party in

---

[64] *Compare Matthews v. Lucas*, 427 U.S. 495, 515 (1976) ("Nor, in ratifying these statutory classifications, is our role to hypothesize independently . . . . These matters of practical judgment and empirical calculation are for Congress."), *with Wetzel*, 139 F.3d at 386 ("Tough legal questions are not answered mechanically, but rather by the exercise of seasoned judgment. Judgment is informed by experience and perspective . . . ."); *see generally Gregory v. Ashcroft*, 501 U.S. 452, 465–67 (1991) (explaining, without resolving, the debate over whether judges make policy).

power. That is why, as the Court explained in *Branti*, a football coach for a state university cannot be discharged because of her political affiliation even though she may formulate policy for the athletic department.[65] And why public defenders, who made some policy decisions in fulfilling their public office, still could not be fired on the basis of their political allegiance—because their policymaking activity did not relate to "any partisan political interest."[66]

To the extent that Delaware judges create policy, they do so by deciding individual cases and controversies before them, not by creating partisan agendas that reflect the interests of the parties to which they belong.[67] Similarly, although the Governor contends that Delaware judges have meaningful input into a major government program because they set the judiciary's budget and create rules of civil and criminal procedure, the operation of the judicial branch is not "so intimately related to [Delaware] policy" that the Governor would have "the right to receive the complete cooperation and loyalty of a trusted advisor [in that position]."[68]

---

[65] *Branti*, 445 U.S. at 518.

[66] *Id.* at 519.

[67] *See Branti*, 445 U.S. at 519–20 ("[W]hatever policymaking occurs in the public defender's officer must relate to the needs of individual clients and not to any partisan political interests. . . . Under these circumstances, it would undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party.").

[68] *Ness*, 660 F.2d at 522 ("[W]e agree with the district court that, as a matter of law, the duties imposed on city solicitors by the York Administrative Code and the undisputed functions

28

The policymaking inquiry is designed to test whether the position in question "is one which cannot be performed effectively except by someone who shares the political beliefs of [the appointing authority]."[69] Put simply, while judges clearly play a significant role in Delaware, that does not make the judicial position a political role tied to the will of the Governor and his political preferences. As such, the policymaking exception does not apply to members of the judicial branch.

We are aware that two of our sister Circuits have concluded otherwise. In *Kurowski v. Krajewski*, the Seventh Circuit determined that the guiding question in political affiliation cases was "whether there may be genuine debate about how best to carry out the duties of the office in question, and a corresponding need for an employee committed to the objectives of the reigning faction," and answered that question in the affirmative with respect to judges and judges pro

---

entailed by these duties e.g., rendering legal opinions, drafting ordinances, [and] negotiating contracts define a position for which party affiliation is an appropriate requirement. In relying on an attorney to perform these functions so intimately related to city policy, the mayor has the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less.").

[69] *Brown*, 787 F.2d at 170. *See also Branti*, 445 U.S. at 517 ("[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency.").

tempore.[70] In *Newman v. Voinovich*, the Sixth Circuit similarly concluded that judges were policymakers who could be appointed on the basis of their partisan affiliation.[71] We find these cases unpersuasive for two reasons.

First, we do not believe, as the Seventh Circuit does, that the policymaking exception described in *Elrod* and *Branti* is merely "shorthand for a broad category of public employees whose work is politically sensitive and who exercise significant discretion in the performance of their duties."[72] Under the Seventh Circuit's view, so long as employees make decisions involving issues about which "political debates rage," they may be hired or fired for their party affiliation.[73]

---

[70] *Kurowksi*, 848 F.2d 767, 770 (7th Cir. 1988) ("A judge both makes and implements governmental policy. A judge may be suspicious of the police or sympathetic to them, stern or lenient in sentencing, and political debates rage about such questions. In most states judges are elected, implying that the office has a political component. Holders of the appointing authority may seek to ensure that judges agree with them on important jurisprudential questions.").

[71] *Newman*, 986 F.2d 159, 163 (6th Cir. 1993) ("We agree with the holding in *Kurowski* that judges are policymakers because their political beliefs influence and dictate their decisions on important jurisprudential matters. . . . Therefore, we believe that Governor Voinovich's appointment of judges based on political considerations is consistent with *Elrod*, *Branti*, and *Rutan*.").

[72] *Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017) (finding that arbitrators on the Illinois Workers' Compensation Commission are policymakers).

[73] *Kurowski*, 848 F.2d at 770.

We have always more narrowly applied the policymaking exception to only the class of employees whose jobs "cannot be performed effectively except by someone who shares the political beliefs of [the appointing authority]."[74] There can be no serious question that judicial candidates of different political parties can effectively serve as state judges. Thus, while "political debates rage" about issues that judges must decide in the course of their state employment, we do not believe that this leaves judges entirely at the whim of state governors and the patronage of the ruling party. While states have nearly unfettered discretion to select state judges, states cannot condition judicial positions on partisan political affiliation alone.

Second, the opinions in *Kurowski* and *Newman* conflate an appointing authority's ability to consider the political beliefs and ideologies of state employees with that authority's ability to condition employment on party loyalty. Under our case law, discrimination based on political patronage is only actionable where the employee's political affiliation was a "substantial or motivating factor in the government's employment decision."[75] *Elrod* and *Branti* protect affiliation—and decisions not to affiliate—with a political party. We have never read them to prohibit an appointing official from considering a job candidate's views on questions and issues related to the job itself. There is a wide gulf between a governor asking a judicial candidate about his philosophy on sentencing, for example, and a governor posting a sign that

---

[74] *Brown*, 787 F.2d at 170.
[75] *Galli*, 490 F.3d at 271.

31

says "Communists need not apply."[76] The former does not run afoul of the First Amendment; but in our view, the latter does. Because the approach of the Sixth and Seventh Circuits would allow governors both to weigh an individual candidate's political beliefs *and* to condition judicial positions on party allegiance, we must disagree.

We therefore conclude that state judges do not fall within the policymaking exception because affiliation with a particular political party is not a requirement for the effective performance of the judicial role.

## 2. Delaware's Interest in Political Balance

We next consider the Governor's second argument, that even if state judges are not policymakers, their political affiliation is still an appropriate condition of state employment. The Court in *Rutan* emphasized that politically motivated employment practices could be constitutional if they are "narrowly tailored to further vital government interests."[77] While most cases following *Branti* have focused on the policymaking exception, which relates to a state's interest in the loyalty and efficiency of key state employees, the Governor argues that Article IV, Section 3 can be justified by a different interest—the interest in political balance. We need not dwell long on whether Delaware possesses a "vital state interest" in a politically balanced judiciary, because Delaware's practice of excluding Independents and third party voters from judicial employment is not narrowly tailored to that interest.

---

[76] *See Keyishian v. Bd. Of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 605–10 (1967).

[77] *Rutan*, 497 U.S. at 74.

The Governor posits that the Supreme Court has always recognized the permissibility of conditioning appointments on political affiliation when the goal is to ensure political balance. In *Branti*, the Court stated that "if a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration."[78] Similarly, in *LoFrisco v. Schaffer* and *Hechinger v. Martin*, the Supreme Court affirmed two district court decisions approving political balance statutes governing elections for a state's boards of education and the District of Columbia's city council, respectively.[79] The Governor also points to several federal administrative agencies that use some form of political balance requirement for decisionmaking bodies, including the Federal Deposit Insurance Corporation, the Federal Trade Commission, the Securities and Exchange Commission, the Federal Communications Commission, the Commission on Civil Rights, the Federal Energy Regulatory Commission, and the Federal Election Commission. These examples show some support for the Governor's argument, but

---

[78] *Branti*, 445 U.S. at 518. The Sixth Circuit, following *Branti*, has categorically held that employment decisions conditioned on political party affiliation are permissible where the position is one of several "filled by balancing out political party representation, or that are filled by balancing out selections made by different government agents or bodies." *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996).

[79] *See LoFrisco v. Schaffer*, 341 F. Supp. 743, 744–45, 750 (D. Conn. 1972), *aff'd* 409 U.S. 972 (1972); *Hechinger v. Martin*, 411 F. Supp. 650, 653 (D.D.C. 1976), *aff'd* 429 U.S. 1030 (1977).

unlike elected officials and agency representatives who explicitly make policy, judges perform purely judicial functions. Further, it is difficult to see how the logic of political balance and minority representation extends from multimember deliberative bodies, like a school board, to Delaware's judiciary, most of whom sit alone.[80]

The Seventh Circuit has also addressed the political balance interest in the judicial context. In *Common Cause Indiana v. Individual Members of the Indiana Election Commission*, the court considered a municipal ordinance prohibiting political parties from nominating candidates for more than half of the eligible seats on its superior court.[81] The Seventh Circuit found that partisan balance concerns are less compelling with respect to judges, who are "not elected [or appointed] to represent a particular viewpoint" and instead are required to "exercise [their] own independent authority to make decisions that uphold and apply the law fairly and impartially."[82] The court also emphasized that "partisan balance amongst the judges who comprise the court, alone, has little bearing on impartiality" because while it can "serve as a

---

[80] The Delaware Supreme Court is the only judicial body in which a panel of judges regularly hears cases as a collective. Even then, panels are usually comprised of three of the five judges on the court. The political balance on a panel, therefore, does not necessarily mirror the political balance of the Supreme Court as a whole. *See* Randy J. Holland and David A. Skeel, Jr., *Deciding Cases Without Controversy*, 5 DEL. L. REV. 115, 121 (2002).

[81] *Common Cause*, 800 F.3d 913, 915 (7th Cir. 2015).

[82] *Id.* at 922–23.

check against contrary partisan interests," it does not affect "the impartiality of individual members."[83]

While we share many of the Seventh Circuit's concerns about conflating party balance with judicial impartiality, we need not resolve the issue today. To justify a rule that impinges an employee's First Amendment association rights, the state must show both that the rule promotes "a vital state interest" and that the rule is "narrowly tailored" to that interest. Even assuming judicial political balance is a vital Delaware interest, the Governor must also show that the goals of political balance could not be realized without the restrictive nature of Article IV, Section 3, and this he has failed to do.

The Governor describes the benefits of balance and details the popularity Article IV, Section 3 has among Delaware judges and former judges. But this cannot suffice as a justification to bar candidates who do not belong to either the Democratic or Republican parties from seeking judicial appointment, because the Governor fails to explain why this is the least restrictive means of achieving political balance. Because the Governor has not shown that Article IV, Section 3 is narrowly tailored to further a vital state interest, the infringement on judicial candidates' association rights is unconstitutional.

## C.    Severability

We need not determine whether the bare majority component, operating alone, would be unconstitutional, because we conclude that the unconstitutional major political

---

[83] *Id.*

party requirement is not severable from the sections of Article IV, Section 3 relating to the Supreme Court, Superior Court, and Chancery Court.

Severability of a state statute or constitutional provision is a question of state law.[84] The Chancery Court has explained that severability analysis under Delaware law proceeds in two steps: first, courts consider whether the "unobjectionable" part of the provision, standing alone, would be capable of enforcement; and second, courts consider whether the legislature intended for the unobjectionable part to stand "in case the other part should fall."[85] In determining whether one portion of a statute or constitutional provision is severable from another, the "touchstone" must always be legislative intent.[86]

Here, there is no question that the bare majority component is capable of standing alone, as it does in the provisions of Article IV, Section 3 involving the Family Court and the Court of Common Pleas. But because we do not think the two components were intended to operate separately, we find that the major political party component is not severable.

For nearly seventy years, the bare majority component and the major political party component have been intertwined in the sections of Article IV, Section 3 pertaining to the

---

[84] *See Contractors Ass'n of E. Pennsylvania*, 6 F.3d at 997 (quoting *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772 (1988)).

[85] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 669 n. 68 (Del. 2014) (quoting *Farmers of Fairness v. Kent Cty.*, 940 A.2d 947, 962 (Del. Ch. 2008)).

[86] *Ayotte*, 546 U.S. at 330; *see also Doe*, 88 A.3d at 669 n. 68.

Supreme Court, Chancery Court, and Superior Court. Both components operate in tandem to dictate the bi-partisan makeup of Delaware's courts. Operating alone, the bare majority component could be interpreted to allow a Governor to appoint a liberal member of the Green Party to a Supreme Court seat when there are already three liberal Democrats on that bench. Only with the (unconstitutional) major political party component does the constitutional provision fulfil its purpose of preventing single party dominance while ensuring bipartisan representation.[87]

Against this backdrop, the Governor has offered no evidence suggesting that the Delaware General Assembly, which authorizes constitutional amendments, intended for the bare majority component to stand even if the major political party component fell. The Governor points to no applicable severability legislation passed by the General Assembly, nor has he shown that in the history of this specific constitutional provision, the General Assembly conceived of the components as independent and separable.[88]

---

[87] *Cf. id.* (finding that two provisions of a housing policy were not severable when they were "enacted[] together" and one provision was designed to "enforce compliance" with the other); *Matter of Oberly*, 524 A.2d 1176, 1182 (Del. 1987) (explaining that severance is only possible if the residual component has "separate purpose and independent legislative significance").

[88] This case, then, is a far cry from cases like *Ayotte* and *Executive Benefits Insurance Agency v. Arkinson*, upon which the Governor relies. In both cases, the laws at issue contained severability clauses that are not present here. *See Ayotte*, 546 U.S. at 331; *Exec. Benefits Ins. Agency*, 573 U.S. 25, 36 (2014);

While we are mindful that we should refrain from invalidating more of a statute than necessary,[89] here, the two substantive components of Article IV, Section 3 are interdependent and equally integral to the political balance scheme Delaware envisioned for the Supreme Court, Superior Court, and Chancery Court. It is not our place to rewrite the balance the General Assembly struck in crafting Article IV, Section 3 ourselves.[90] Finding that the major political party component cannot be severed, we conclude that the sections of Article IV, Section 3 containing the major political party component are unconstitutional and must be stricken.

## III. Conclusion

For the foregoing reasons, we find that Adams has shown that his freedom of association rights were violated by the political balance requirement that prevented his application

---

*see also State v. Dickerson*, 298 A.2d 761, 766 (Del. 1972), *abrogated on other grounds by Woodson v. North Carolina*, 428 U.S. 280 (1976) (finding statutory provisions severable because of Delaware's general severability statute).

[89] *Cf. Dickerson*, 298 A.2d at 766 n. 11 ("Any doubt, as to the correctness of our conclusion on severability, is resolved by the maxims that a statute must be held valid if it is possible for the court to do so; that every presumption must be resolved in favor of its validity; and that it should not be declared unconstitutional unless the court is convinced of that status beyond a reasonable doubt.").

[90] *See Ayotte*, 546 U.S. at 329 ("[W]e restrain ourselves from rewriting state law . . . even as we strive to salvage it." (internal punctuation marks and citation omitted)).

to the Supreme Court, Superior Court, and Chancery Court. Therefore, we conclude that the first three sections of Article IV, Section 3 violate the First Amendment. We affirm the District of Delaware's order granting summary judgment to Adams on those sections. Because Adams had no standing to challenge the sections of Article IV, Section 3 dealing with the Family Court and the Court of Common Pleas, however, we reverse the District of Delaware's order as it pertained to those sections.

McKEE, *Circuit Judge*, concurring. Judges Restrepo and Fuentes join.

I join my colleagues' thoughtful opinion in its entirety. I write separately merely to add the perspective of someone who has served as a state court judge in a jurisdiction that selects judges in general elections preceded by partisan political campaigning and the fundraising that is endemic to political campaigns. In doing so, I certainly do not mean to in anyway cast aspersions upon the many dedicated, intelligent and hardworking men and women whom the electorate in such jurisdictions ultimately select to serve as judges. I only wish to note the potential damage to the image of the judiciary in such jurisdictions and the extent to which it can undermine the public's faith in the judges who are elected.[1]

All of us have a keen understanding of, and appreciation for, the fact that the provisions we strike down today were enacted to ensure selection of a judiciary whose political balance would serve notice that judicial decisions were devoid of politics and political motivations. Paradoxically, by elevating one's political affiliation to a condition precedent to eligibility for appointment to the bench by the Governor, Delaware has institutionalized the role of political affiliation

---

[1] The criticism of systems where judges are elected has stressed the importance of such irrelevant factors as campaign contributions and the importance of ballot position. *See* The Inquirer Editorial Board, Editorial, *Close Down the Circus: Replace Judicial Elections with Merit Selection*, PHILA. INQUIRER, (July 13, 2018) (http://www.philly.com/philly/opinion/editorials/judicial-election-merit-selection-pennsylvania-election-reform-20180713.html) ("In Pennsylvania we elect judges in partisan elections . . . The corrosive effects of money work over time until it is impossible for people to trust the court system."); Ryan Briggs, *Does Ballot Position Matter? Science Says 'Yes,'* CITY AND STATE PENNSYLVANIA (Dec. 20, 2016), https://www.cityandstatepa.com/content/does-ballot-position-matter-science-says-%E2%80%98yes%E2%80%99 (last visited Jan. 17, 2019) ("Sheer luck has more to do with becoming [a] judge in the city [of Philadelphia] than experience or endorsements.").

rather than negated it. As we explain, the resulting system of judicial selection is in conflict with the First Amendment right of association even though it has historically produced an excellent judiciary; accordingly, it cannot survive this First Amendment challenge. Although this is as paradoxical as it is ironic, it is really not surprising that the judicial system that has resulted from Delaware's political balance requirements is as exemplary as the judges who comprise it.

In 2011, then-Delaware Supreme Court Justice Randy J. Holland presciently observed that the "political balance provisions appear to prevent the appointment of persons belonging to a third political party or having no party affiliation. To date, however, there has been no court challenge to this requirement under the United States Constitution."[2] Justice Holland's observation about the absence of challenges to the 122 year-old constitutional framework that plainly implicates the First Amendment is understandable given the well-earned excellent reputation of the state courts it has produced.

Praise for the Delaware judiciary is nearly universal, and it is well deserved. Scholars and academics routinely refer to Delaware's courts as the preeminent forum for litigation, particularly for cases involving business disputes.[3] On the bicentennial anniversary of the establishment of the Court of Chancery, then-Chief Justice Rehnquist observed that the "Delaware state court system has established its national preeminence in the field of corporation law" and identified such hallmarks of the Court of Chancery as its "[j]udicial efficiency and expertise, a well-paid and well-respected judiciary, innovative judicial administration [and] courageous

---

[2] Randy J. Holland, THE DELAWARE STATE CONSTITUTION 149 (2011).

[3] *See, e.g.*, Omari Scott Simmons, *Delaware's Global Threat*, 41 J. OF CORP. L. 217, 224 (2016) (referring to the "preeminence of Delaware's courts in resolving corporate disputes"); Ehud Kamar, *A Regulatory Competition Theory of Indeterminacy in Corporate Law*, 98 COLUMBIA L. REV. 1908, 1926 (1998) ("Delaware courts have earned a unique reputation for quality adjudication").

leadership."[4] Members of the Delaware bench credit the political balancing requirement for at least part of this success.[5] With that national reputation so firmly established, it is perhaps not surprising that attorneys contemplating judicial candidacy have not previously challenged this constitutional framework.[6]

---

[4] William H. Rehnquist, Chief Justice of the United States, Address at the Bicentennial of the Delaware Court of Chancery (Sep. 18, 1992) *in The Prominence of the Delaware Court of Chancery in the State-Federal Joint Venture of Providing Justice*, 48 THE BUSINESS LAWYER 1 (1992).

[5] *See, e.g.*, Devera B. Scott, et al., *The Assault on Judicial Independence and the Uniquely Delaware Response*, 114 PENN ST. L. REV. 217, 243 (2009) (quoting President Judge Jan R. Jurden as saying the "Delaware judicial nominating process goes to great pains to ensure a balanced and independent judiciary, and, therefore, it is no surprise that the public perceives Delaware courts as fair arbiters of justice."); E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004? A Retrospective on Some Key Developments*, 153 U. PA. L. REV. 1399, 1401 (2005) (former Chief Justice of the Delaware Supreme Court stating that Delaware's judicial "system has served well to provide Delaware with an independent and depoliticized judiciary and has led . . . to Delaware's international attractiveness as the incorporation domicile of choice."); Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 DEL. J. CORP. L. 673, 683 (2005) (Chief Justice of the Delaware Supreme Court noting that its judicial selection process has resulted "in a centrist group of jurists committed to the sound and faithful application of the law.").

[6] Indeed, one of this court's two courtrooms is named for Collins J. Seitz; a legendary judge of national prominence who served with great distinction as a judge on the Delaware Court of Chancery before being appointed to this court by President Johnson in 1966.

While sitting on the Delaware Court of Chancery, Judge Seitz decided *Belton v. Gebhart,* 87 A.2d 862 (1952) in which he courageously ordered the desegregation of the Delaware public schools two years before the United States Supreme Court struck down the doctrine of "separate but equal" in

But that excellence cannot justify the constitutional transgression that is baked into the selection process. As we explain,[7] despite the state's interest in achieving a judicial system that is as fair in fact as it is in appearance, the provisions of the Delaware Constitution restricting who can apply for judicial appointment are not narrowly tailored to achieve their laudatory objectives. Accordingly, we need not decide whether Delaware has a "vital state interest" that justifies the limitations on political affiliation. That question may be decided in a future case. Moreover, Delaware may choose to amend its Constitution in a manner that achieves the goals of the problematic political affiliation requirements without their attendant constitutional infirmities.

No matter what ensues, I have little doubt that the constitutional provisions which we today invalidate have resulted in a political and legal culture that will ensure the

_____

*Brown v. Bd. Of Educ.* 347 U.S. 483 (1954). The appeal from his decision there was one of the four consolidated cases before the Court in *Brown* where the Supreme Court affirmed the view Judge Seitz had expressed in ordering the desegregation of the Delaware's schools rather than ordering Delaware to make its "Negro" schools equal to those serving White students. In *Belton,* Judge Seitz based his ruling on his factual conclusion that the Negro schools were inferior to White schools and therefore not equal; the approach that was then required under *Plessy v. Ferguson*, 163 U.S. 537 (1896)*.*

Nevertheless, in reaching his decision, Judge Seitz clearly stated that the doctrine of *Plessy* was itself an anathema to the United States Constitution because segregated schools were, by definition, unequal. Foreshadowing *Brown,* he wrote: "I believe that the 'separate but equal' doctrine in education should be rejected, but I also believe its rejection must come from [the Supreme Court.]." *Belton*, 87 A.2d at 865. His decision was later aptly described as a demonstration of Judge Seitz's "courage and moral clarity." William T. Allen, *The Honorable Collins J. Seitz: Greatness in a Corporate Law Judge*, 16 FALL DEL. LAW 5, 3. (1998).

It is particularly appropriate to mention Judge Collins Seitz here because he is such a dramatic example of the judicial excellence I am referring to in extolling Delaware's judiciary.

[7] Maj. Op, at 24–25.

continuation of the bipartisan excellence of Delaware's judiciary. That culture appears to be so firmly woven into the fabric of Delaware's legal tradition that it will almost certainly endure in the absence of the political affiliation requirements that run afoul of the First Amendment.